19-8091

19-8092

19-8093

## AFFIDAVIT OF SPECIAL AGENT MEAGHAN FLEURY IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

### INTRODUCTION AND AGENT BACKGROUND

1.       I am a Special Agent with the United States Department of Health and Human

Services, Office of Inspector General ("HHS-OIG"), and have been so employed since

December 2010.  Currently, I am assigned to HHS-OIG's Regional Office of Investigations in

Boston, Massachusetts.  Prior to joining HHS-OIG, I worked as an Investigator in the Medicaid

Fraud Division of the Attorney General's Office where I investigated allegations of fraud, waste,

and abuse in the Medicaid program.  I hold a Bachelor of Science degree in Criminal Justice and

a minor in Business Administration.

2.       As a Special Agent with HHS-OIG, I am responsible for investigating allegations

of health care fraud affecting public health care benefit programs such as Medicare and

Medicaid.  I have participated in a variety of such investigations, during the course of which I

have interviewed witnesses, conducted physical surveillance, executed arrest and search

warrants, and reviewed various forms of evidence including website and email data, Medicare

and Medicaid claims data, medical records, invoices, and other business records.

3.       Through my training, education, and experience, I am familiar with a variety of

fraud schemes involving public health care benefit programs.  I have participated in numerous

investigations into health care fraud and the provision of kickbacks to health care providers to

induce the purchase of pharmaceuticals or medical devices, in violation of 18 U.S.C. § 1347

(Health Care Fraud), 42 U.S.C. § 1320a-7b (the Anti-Kickback Statute), 18 U.S.C. § 1510

(obstruction of criminal investigation); 18 U.S.C. § 1512 (tampering with a witness); and 18

U.S.C. § 1518 (Obstruction of a Criminal Investigation of a Health Care Offense).  Specifically, I

know that the Anti-Kickback Statute penalizes the knowing and willful offer or payment of any

1

remuneration, whether direct or indirect, overtly or covertly, in cash or in kind, to any person to
induce such a person to purchase, or recommend purchasing, any good or item paid for in whole
or in part by a Federal health care program.  I also know that the Anti-Kickback Statute penalizes
the knowing and willful solicitation or receipt of any remuneration, whether direct or indirect,
overtly or covertly, in cash or in kind, to any person in return for referring an individual to a
person for the furnishing or arranging for the furnishing of any item or service for which
payment may be made in whole or in part under a Federal health care program.  I know that 18
U.S.C. § 1518 penalizes the willful obstruction of the communication of information or records
relating to a violation of a Federal health care offense.  I also know that 18 U.S.C. § 1510 makes
it unlawful to willfully obstruct, delay, or prevent the communication to a criminal investigator
of information relating to a violation of any criminal statute by means of bribery.  Finally, I
know that 18 U.S.C. § 1512 makes it unlawful to corruptly obstruct, influence, or impede (or
attempt to do so) any official proceeding.

      4.      I am also familiar with the Physician Payment Sunshine Act, which Congress
enacted in 2010 to bring transparency to financial relationships between physicians and medical
device manufacturers and other entities.  The Physician Payment Sunshine Act requires device
manufacturers to report to the federal government payments made by manufacturers to
physicians.  The government then makes this payment information available to the general public
through the Centers for Medicare and Medicaid Services' public website
www.cms.gov/openpayments.

2

5.      I am currently investigating Dr. Kingsley R. Chin, Aditya Humad, Vanessa Dudley, SpineFrontier, Inc. ("SpineFrontier"), Impartial Medical Experts, LLC ("IME")[1], and KIC Ventures, LLC ("KIC Ventures") for violating the Anti-Kickback Statute, among other things.  The investigation is being conducted by the United States Attorney's Office, the Department of Justice, HHS-OIG, and the Federal Bureau of Investigation (collectively, the "Investigative Team").

6.      SpineFrontier is a medical device development company located at 350 Main Street, Malden, Massachusetts.  SpineFrontier registered as a Massachusetts corporation in July 2006.

7.      Kingsley R. Chin ("Chin") is a surgeon and is SpineFrontier's President, Chief Executive Officer ("CEO"), and Director.

8.      Aditya Humad ("Humad") is SpineFrontier's Chief Financial Officer ("CFO") and Vice President of Business Development.

9.      IME registered as a Delaware corporation in May 2012, and currently identifies its business address as 3296 N. Federal Highway #11631, Fort Lauderdale, Florida.  This address is the location of the Coral Ridge branch of the United States Postal Service, and box number 11631 is a post office box at that post office.

10.      Vanessa Dudley ("Dudley") is the "Client Relations/Business Administrator" for IME, and the only known employee of IME.[2]

---

[1] According to its certificate of formation, IME was incorporated in Delaware under the name "Impartial Medical Expert, LLC".  IME's bank account also uses this same entity name.  IME does business as "Impartial Medical Experts, LLC" and as "Impartial Medical Experts".

[2] Dudley is Chin's current wife.  The two married in 2015.

11.     John Balzer ("BALZER") is the owner of Bioinnovations, which, among other things, acts as a distributor for medical device manufacturers, such as SpineFrontier.  Balzer resides at 8645 Woodland Terrace, Lenexa, Kansas, 66220.

12.     BIOinnovations LLC ("BIOinnovations") is a limited liability company, which BALZER owns and operates and which was formed as an entity in Kansas City, Kansas on October 28, 2008.  According to the Kansas Secretary of State's Office website, the mailing address and registered office address for BIOinnovations is 8645 Woodland Terrace, Lenexa, Kansas, 66220.

13.     KIC Ventures is a Florida corporation and SpineFrontier's parent company. According to the website www.kicventures.com, the company "manages several portfolio companies, investing in cutting edge technology in the healthcare and health-services sector." Like SpineFrontier, KIC Ventures operates out of 350 Main Street, Malden, Massachusetts. Chin is also the founder and CEO of KIC Ventures.

14.     For the reasons set forth below, I submit that there is probable cause to believe that Chin, Humad, Dudley, BALZER, SpineFrontier, IME, and KIC Ventures, through their managing employees, have conspired to pay, and have paid, remuneration to physicians to induce the purchase of spine surgery devices that were paid for by federal health care benefit programs, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), the Anti-Kickback Statute.  I also submit that there is probable cause to believe that BALZER has violated 18 U.S.C. § 1510 (obstruction of criminal investigation); 18 U.S.C. § 1512 (tampering with a witness); and 18 U.S.C. § 1518 (Obstruction of a Criminal Investigation of a Health Care Offense).  These violations are hereinafter referred to as the TARGET OFFENSES.

15.     I submit this affidavit in support of an application for a warrant under

18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure to search and seize

the email account identified as BIOinnovations@sbcglobal.net, other user-generated data

associated with this account, and associated subscriber, transactional, and user connection

information associated with the account, as described in Attachments A-3 and B-3. I have

probable cause to believe that the email account BIOinnovations@sbcglobal.net contains

evidence, fruits, and instrumentalities of the violations identified above. Based upon publicly

available domain name subscriber information, I have probable cause to believe that the account

and relevant data are maintained by the following provider, as described in Attachment A-3:

      a.     AT&T Internet Services ("AT&T"), 11760 U.S. Hwy 1, Suite 600 North Palm Beach, FL 33408, which accepts service of process at fax number 888-938-4715.

16.     I also submit this affidavit in support of an application for a warrant pursuant to

Rule 41 of the Federal Rules of Criminal Procedure to search the following:

      a.     BALZER'S RESIDENCE, located at 8645 Woodland Terrace, Lenexa, KS 66220, as more fully described in Attachment A-1.

      b.     BALZER, who is a 41 year-old Caucasian male. He is approximately 6 feet tall and currently weighs approximately 200 lbs. He has green eyes and brown-ish, gray hair. A photograph of BALZER appears in Attachment A-2.

(collectively, the "TARGET LOCATIONS"), and to seize evidence, instrumentalities, the fruits

of crime, and contraband, as more fully described in Attachment B-1 (for the BALZER

RESIDENCE), Attachment B-2 (for BALZER), and Attachment B-3 (for

BIOinnovations@sbcglobal.net),

17.     The facts in this affidavit come from my personal observations and review of

records, my training and experience, and information obtained from other agents and witnesses.

This affidavit is intended to show merely that there is sufficient probable cause for the requested

warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE TO BELIEVE FEDERAL CRIMES WERE COMMITTED

### Background

18.     The Medicare Program ("Medicare") is a federally-funded health plan which provides health care coverage to the nation's elderly and certain disabled individuals.  The United States Department of Health and Human Services administers the program and the Centers for Medicare and Medicaid Services ("CMS") supervises it.   The Medicaid Program ("Medicaid") is a Federal health care program providing benefits for low-income beneficiaries. Funding for Medicaid is shared between the federal and state governments.  At the Federal level, Medicaid is administered by CMS.

19.     Medicare and Medicaid are each a "health care benefit program" as defined by 18 U.S.C. § 24(b) and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

20.     SpineFrontier designs, develops, and sells surgical implant devices and instruments for use in surgical spine procedures.  SpineFrontier offers at least twenty-two (22) medical devices, including devices used for cervical and lumbar spine fusion surgeries. SpineFrontier markets its devices to physicians throughout the United States.

21.      Hospitals or surgical centers where surgeons perform surgical procedures, such as spinal fusion surgery, will typically submit a claim for reimbursement to patients and/or insurance carriers, including Medicare or Medicaid, for the costs associated with a surgery inclusive of medical device costs.  The physician will typically submit a separate claim for reimbursement to patients and/or insurance carriers, including Medicare or Medicaid, for the physician's services rendered during the surgical procedure.

### The Kickback Scheme

22.     The investigation to date has revealed evidence that SpineFrontier is engaged in a scheme to pay, or offer to pay, illegal remuneration to physicians to induce the purchase of spine

surgery devices that are paid for by Medicare and Medicaid. Specifically, SpineFrontier uses

IME, an apparent shell company, to retain physicians as "consultants." Ostensibly,

SpineFrontier, often via IME, claims that it pays its physician-consultants in exchange for their

feedback on, or evaluation of, SpineFrontier's products. The investigation has uncovered,

however, that SpineFrontier often pays its physician-consultants simply in exchange for the

physician-consultants' use of the Company's products.

Chin, Humad, Dudley and SpineFrontier Form Impartial Medical Experts

23.     In November 2012, CHIN opened a bank account for IME at Bank of America in

Oakland Park, Florida. CHIN signed the signature card for the account on November 10, 2012,

and listed himself as the "manager" of the account.

24.     On September 24, 2013, DUDLEY submitted an application for a post office box

at the Coral Ridge Post Office at 3296 N. Federal Highway, Fort Lauderdale, Florida. DUDLEY

applied for the post office box on behalf of IME and identified herself as IME's business

administrator. The Coral Ridge Post Office assigned IME post office box number 11631.

25.     The investigative team is in possession of a letter dated September 26, 2013,

written by SpineFrontier's CFO HUMAD and General Counsel, Paul Speidel ("Speidel"), and

addressed to "Clinical Advisors." The letter states:

> [I]n lieu of [sic] the Physician Payments Sunshine Act, [and the] Anti-
> Kickback Statute . . . we are taking the steps to remove direct consulting
> relationships with surgeons to lessen the potential risks of conflict. We
> have chosen to outsource all related consulting services to Impartial
> Medical Experts (IME) . . . SpineFrontier, Inc. has authorized IME to
> manage its entire spine consulting services at a fair market rate of up to
> $500 per hour, which will replace any existing clinical advisor agreements
> effective October 1, 2013. For example, a product evaluation may take up
> to two hours depending on the complexity of the system.

26.     The investigative team is also in possession of a letter written that same day, in

which DUDLEY wrote to physicians on behalf of IME stating:

> In view of your position as a leader in the field of spine surgery, Impartial Medical Experts (IME) kindly invites you to join our medical expert referral service as a member of IME's leading panel of consultants providing product evaluations, product development, lectures, and medico-legal expert opinions for our clients . . . As an IME consultant, you would provide services to medical device clients that include product evaluations, product development, industry trend analysis, research publications or product training and lectures . . . Feel free to contact me at VanessaDudley@call-ime.com . . . should you have any questions or comments.

SpineFrontier Pays Physicians Through IME

27.     In August 2015, the investigative team interviewed J.M., who was Vice President of Sales for SpineFrontier between August 2014 and April 2015.  J.M. reported that SpineFrontier's top 30 physicians, which accounted for 98% of SpineFrontier's sales, were all "consultants" for IME.  J.M. further reported that CHIN owned IME and that CHIN and HUMAD told J.M. that they created IME in order to separate SpineFrontier from its payments to physicians so as to avoid reporting obligations under the Physician Payment Sunshine Act.

The SpineFrontier and IME Consulting Agreements and Forms

28.     The consulting agreement that SpineFrontier and IME sent out to potential physician-consultants suggested that IME was independent of SpineFrontier.  The language of the agreement and the cover letter with which the agreement was sent to potential physician consultants indicated that IME and SpineFrontier were separate entities.  It also suggested that (a) IME was a referral service that provided product consulting and expert witness assignments, (b) IME had multiple, different clients, and (c) SpineFrontier was only one among those multiple clients:

> In view of your position as a leader in the field of spine surgery, Impartial Medical Experts (IME) kindly invites you to join our medical referral service as a member of IME's leading panel of consultants providing product evaluations, product development, lectures, and medico-legal expert opinions for our **clients**.   At IME, we aim to create a link between the most qualified doctors and those **clients** seeking out an objective professional voice.  IME

8

clients contract with us to take advantage of our relationship with consultants such as you, enabling these **clients** to address their myriad medical expert needs through us.

\* \* \*

IME manages a referral service providing product consulting and expert witness assignments to **certain technology companies**, **law firms**, **insurance companies**, and other **interested parties** ("**Clients**"). IME has undertaken significant effort and incurred significant expense to refer one or more consulting opportunities to the Consultant.

In truth, the **only** "client" of IME was SpineFrontier, which was owned by CHIN, operated by CHIN's girlfriend (now wife), and funded by money from SpineFrontier.

29.     Under the IME contract, physician-consultants were told to submit the number of hours they worked on timesheets referred to in the contracts as "Form A." An example of Form A is below:



There was no area or box on this form in which to provide comments regarding the substance of the consulting or substantive written feedback about any product evaluations performed by the

physician consultant.  Nor was there any other form that IME or SpineFrontier provided to potential physician consultants to guide them through their "evaluations" or for them to fill out during their evaluations.

30.      In early 2014, IME moved to an online system where physician-consultants were told to log the number of hours they spent performing evaluations, among other things.  There was a specific section in the online portal where physician-consultants could put "comments." The Government obtained online submissions that numerous physician-consultants made to IME.  A representation of one of these submissions is below:

| submitted_time | | | |
|---|---|---|---|
| signature   Paul DeGenova | | | |
| month_submitted_for | 3/1/2014 | user_id | 32 |
| submitted_date | 5/29/2014 | time_id | 105 |
| total_cervical_product_time | 1.5 | total_cervical_product_time_approved | 1.5 |
| total_lumbar_product_time | 8 | total_lumbar_product_time_approved | 8 |
| total_training_time | 0 | total_training_time_approved | 0 |
| total_research_paper_time | 0 | total_research_paper_time_approved | 0 |
| total_discuss_time | 5 | total_discuss_time_approved | 3.5 |

| review_completed  checked | dbmpure_macro | facetfuse |
|---|---|---|
| cervical | cancellous_chips | facetfuse_allo |
| biologics | dbmform | pedfuse_return |
| lumbar | amniotic_tissue | pedfuse_respon |
| other1 | arena_l | pedfuse_reset |
| other2 | arena_l_allo | pedfuse_remind |
| arena_c | s_lift | misquito |
| invue | p_lift | inspan |
| invue_max | t_lift | inspan_slim |
| inset | e_lift | allo_span |
| dbmpure_micro | tilt | |

comment

Numerous online forms that physician-consultants submitted – like this one – contained no information in the "comment" section.

31.     The IME physician-consultant agreement also contained language about how physician consultants should track the time they spent performing evaluations suggesting that they bill 30-60 minutes for cervical product evaluations and 1-2 for lumbar product evaluations: "It is expected that a cervical spinal product / construct evaluation is conducted within approximately 30-60 minutes, and a lumbar product / construct evaluation is conducted within approximately 1-2 hours.  This will not include time spent utilizing and / or implanting spinal products."

32.     In truth, as discussed in more detail below, individuals at SpineFrontier, including CHIN and HUMAD, told surgeons that they should bill 2 hours for any lumbar surgery they performed using SpineFrontier products and 1 hour for any cervical surgery they performed using SpineFrontier products.  As an example, one SpineFrontier representative wrote the following to a physician-consultant about how the particular physician-consultant could bill for surgeries he performed using SpineFrontier products:

> [The consulting agreement] goes into how the pay structure works for different things, but for the sake of the new trial advisor and product evaluation it is as I described earlier, flat rate of $500 / cervical evaluated and $1000 / lumbar evaluated.  There is no cap to the amount of cases you can evaluate.

33.     Some surgeons claim that they billed the actual time they worked, though documentation to support that time frequently is lacking.  However, consistent with the guidance provided by SpineFrontier, CHIN, and HUMAD, certain physician-consultants with whom the Government has spoken were paid by SpineFrontier based on the number and type of surgeries they performed using SpineFrontier products, and not based on the amount of time actually engaged in consulting activities (if any) or the value of actual consulting work performed (if any).  Below is an example of one such physician consultant.

Dr. JM

34.    Dr. JM is a spine surgeon who has an office in Kansas City, Missouri. He began

using SpineFrontier products in late 2012 / early 2013.   While SpineFrontier employs sales

representatives to support physicians to whom it sells its products, for some areas of the country

or some physician-customers, SpineFrontier instead works with distributors to provide customer

support. Distributors are independent contractors and not fulltime employees of SpineFrontier.

35.    Dr. JM worked with a SpineFrontier distributor named John Balzer ("BALZER").

BALZER acts as a SpineFrontier distributor under the name of a Kansas Limited Liability

company named BIOinnovations LLC ("BIOinnovations"), which BALZER owns and operates

and which was formed as an entity in Kansas City, Kansas on October 28, 2008. According to

the Kansas Secretary of State's Office website, the mailing address and registered office address

for BIOinnovations is 8645 Woodland Terrace, Lenexa, KS  66220.  BALZER and Dr. JM are

friends and own a Jimmy Johns franchise together.

36.    BALZER spoke with Dr. JM in 2013 and told Dr. JM that Dr. JM would get 10%

of the revenue SpineFrontier made from SpineFrontier products used in Dr. JM's surgeries in the

form of "consulting" payments. Sometime shortly after this conversation, Dr. JM spoke over the

phone with HUMAD.  During that call, HUMAD brought up the 10% arrangement and told Dr.

JM that SpineFrontier would pay Dr. JM 10% of the revenue SpineFrontier made off

SpineFrontier products used in Dr. JM's surgeries, up to a preset cap of $200,000.  HUMAD also

said that Dr. JM would provide feedback, but HUMAD did not spend much time discussing

expectations about what Dr. JM would do. According to Dr. JM, the discussion was all about the

money.  HUMAD wanted Dr. JM to use SpineFrontier products in 100% of his surgeries.

37.    After Dr. JM spoke with HUMAD, he had a conversation with CHIN in early

2013. CHIN told Dr. JM that if Dr. JM used all, or the majority of, SpineFrontier products, then

the cap on the amount of consulting fees Dr. JM could receive from SpineFrontier would be raised.

38.     The Investigative Team is in possession of a March 11, 2013 email exchange between HUMAD and Dr. JM, copying CHIN, in which HUMAD writes to Dr. JM: "Based on your increased interest and availability for feedback on several products, we have increased total hours with an annual fee [from $200,000] up to $300,000.  Shortly after HUMAD sent this email, CHIN wrote back to HUMAD privately, saying "Thxs."  A day later, in a March 12, 2013 internal email exchange between CHIN, HUMAD, and a SpineFrontier Territory Manager, the Territory Manager told CHIN and HUMAD:  "I spoke with [Dr. JM] tonight and we are good. He understands our position and is willing to totally involve himself and use us for all his cases."

39.     Records from SpineFrontier, IME, and Dr. JM show that Dr. JM began receiving payments from SpineFrontier in 2013 and that he signed an agreement to act as a consultant with SpineFrontier that same year.  Based on records from Dr. JM and SpineFrontier, SpineFrontier and IME paid Dr. JM the amounts listed below from 2013 to 2015.  The agreements in place between Dr. JM and SpineFrontier and Dr. JM and IME provide for an hourly rate of $500 for Dr. JM for 2013 and 2014.  Based on Dr. JM's hourly rate, he submitted (or caused to be submitted) the approximate number of hours listed below for each year:

- 2013 – $139,250 (over 275 hours)
- 2014 -- $136,800 (over 270 hours)
- 2015 -- $103,668 (over 130 hours up through October 2015)[3]

40.     Records obtained from SpineFrontier and Dr. JM regarding Dr. JM's relationship with SpineFrontier reveal very little written communications relating to actual consulting work Dr. JM performed.  Based, in part, on the lack of documentation supporting the payments Dr. JM

---

[3]     I have seen a document indicating that in March 2015, SpineFrontier increased Dr. JM's hourly rate to $750.

received from SpineFrontier, it appeared that Dr. JM was not performing the amount of work described in the submissions to SpineFrontier to justify SpineFrontier's subsequent payments to Dr. JM.

41.     In 2013, despite being paid over $100,000 by SpineFrontier and IME, Dr. JM estimates that he only performed 50% of the hours reported.   In addition, Dr. JM did not fill out the Form A that was submitted to SpineFrontier on his behalf each month.  Instead, BALZER frequently filled in the hours on the Form A and Dr. JM signed that form.

42.     One of the primary tasks for which SpineFrontier was purportedly paying Dr. JM was his evaluation of SpineFrontier products.  Internal company documents show that Dr. JM used approximately nine different SpineFrontier products during 2013:

- Inspan
- Inspan Slim
- Amniotics
- DBMForm
- DBMPure Macro
- Cancellous Chip / Crush / Morsel
- FacetFUSE
- Putty and gel
- Pedicle screws

According to these documents, Dr. JM used some of these products, such as the Inspan Slim (an interspinous clamp) over 70 times in 2013.  These documents show that Dr. JM used other products, such as the Putty and Gel, only once or twice.  Despite this, there are few, if any, memos or emails reflecting any consulting or evaluation Dr. JM supposedly performed on SpineFrontier products in 2013.

43.     Those same internal company documents showed that, during the next year, 2014, Dr. JM used five SpineFrontier products he had used in the year prior, plus just one new SpineFrontier product. Taken together, Dr. JM used the following six products in 2014:

- Inspan Slim

14

- Inspan
- DBMForm
- DBMPure Macro
- DBMPure Micro
- Amniotics

Despite Dr. JM using only one purportedly new product in 2014, SpineFrontier paid him over

$135,000 – the equivalent of over 270 hours of work at his $500 per hour rate – for consulting

and evaluating SpineFrontier products.

44.     According to Dr. JM, BALZER and HUMAD frequently told him how many

hours to put on his timesheet.  The process worked as follows:  Dr. JM would ask BALZER how

many hours he should bill to SpineFrontier / IME.  BALZER would then ask HUMAD how

many hours Dr. JM could put on his timesheet.  In response, HUMAD would provide BALZER

with that figure, and BALZER would in turn put that number of hours on the IME /

SpineFrontier timesheet, which Dr. JM subsequently would sign.  Dr. JM estimates that the

process worked this way about 75% of the time.

45.     In 2014, Dr. JM wrote few, if any, any emails to SpineFrontier about his

evaluation of the five SpineFrontier products he used repeatedly that year.  From January 2014

through September 15, 2014, Dr. JM provided almost no documentation at all regarding the

evaluations he purportedly did on SpineFrontier products during that time period.

46.     In September 2014, in an effort to make the payments from SpineFrontier appear

more legitimate, Dr. JM created – for the first time – a "Surgeon Evaluation Form."  Dr. JM

filled out information on those evaluation forms between September 2014 and early 2015 and

provided the evaluation forms to BALZER.  Dr. JM later stopped filling in these evaluation

forms because he felt like he had given enough and could not evaluate the same SpineFrontier

products anymore.  BALZER never sent those evaluation forms – approximately 50 of them – to

SpineFrontier and they sat at his home.

15

47.      According to Dr. JM, despite receiving over $135,000 from SpineFrontier in 2014, he did not do much consulting work that year. Instead, the hours for which SpineFrontier paid him in 2014 mostly were dictated to him by HUMAD and BALZER in the manner described above. Dr. JM stated that during 2014, SpineFrontier engineers came to visit him on two occasions, but the visits did not last more than a couple of hours. Dr. JM also met in person at a coffee shop with HUMAD once in 2014. Other than those interactions, no one at SpineFrontier went to visit Dr. JM and obtain feedback from him. No one at SpineFrontier reached out to Dr. JM in 2014 to determine whether Dr. JM had more feedback to provide concerning his use of the six products identified above.

48.      In 2015, SpineFrontier paid Dr. JM over $103,000 through the month of October. According to Dr. JM, he did not do $103,000 worth of consulting work in 2015 for SpineFrontier. Throughout the time SpineFrontier paid Dr. JM in 2015, Dr. JM was told how many hours to submit to SpineFrontier in the same manner described above: BALZER would ask HUMAD how many hours Dr. JM could bill; HUMAD would tell BALZER how many hours Dr. JM could bill for, and BALZER would relay that figure to Dr. JM, who would sign his timesheet.

**Medicare and Medicaid Are Billed for Surgeries Performed by IME-paid Surgeons**

49.      In order to seek reimbursement from Medicare or Medicaid, a healthcare provider submits a claim containing specific billing codes related to the services rendered and/or devices and products furnished. Since a specific type of medical device or product, such as spine fusion devices, can be manufactured by any number of different manufacturers, the billing codes for devices are often generic and do not identify a particular manufacturer's device. It is therefore not always possible to determine the specific device or product, or its corresponding

manufacturer, solely from reviewing the billing codes submitted on a Federal health care program claim.

50.     I have reviewed IME's bank records and have identified at least 27 physicians who received payments from IME between November 2013 and January 2016.  All 27 physicians are enrolled as Medicare providers, and as such, can submit claims to Medicare for services.

51.     I have reviewed Medicare claims for spine fusion surgeries rendered between November 2013 and January 2016 by the 27 physicians paid by IME.  Of the 27 physicians, 26 physicians, including Dr. JM, are listed as the operating surgeon for spine fusion surgeries that were billed to Medicare during the time frame that they received payments from IME.  In addition, Dr. JM stated that he performed surgeries utilizing SpineFrontier products in surgeries reimbursed by Medicaid.

### Obstruction of a HealthCare Investigation by BALZER

BALZER's Discussions with Dr. JM After Learning of the Government's Investigation into SpineFrontier

52.     In September 2017, after the Government issued subpoenas to SpineFrontier, IME, and KIC, Dr. JM learned from BALZER of the Government's investigation into SpineFrontier and its consulting arrangements with physicians.  BALZER had learned of the investigation from HUMAD.  Dr. JM already was very concerned about his involvement with SpineFrontier and the payments he was receiving from SpineFrontier.  Dr. JM knew that his payments were tied to his product usage, not to actual consulting work.  He also knew that he did not have documentation to substantiate the number of hours for which SpineFrontier paid him.

53.     At this point, Dr. JM created and recreated false documentation to justify the number of hours of purported consulting and evaluation for which he was paid.

54.     After learning about the Government's investigation in September 2017, BALZER and Dr. JM took steps to coordinate their stories.  Dr. JM and BALZER discussed in person coordinating their false stories.  On more than one occasion, BALZER and Dr. JM left their phones in one location while the two of them went to a different location to talk about the Government's investigation and coordinating their stories.  Based on the circumstances, this behavior is indicative of two people who were concerned that they could be subject to audio recording.

55.     Dr. JM and BALZER decided that their story for the investigation would be that Dr. JM gave his consulting / evaluation hours to BALZER to put on the timesheet.  This was untrue.  Dr. JM and BALZER also decided to try to make it sound like Dr. JM provided SpineFrontier with more feedback than Dr. JM actually provided.  The two agreed they would say they were "working hard" on the consulting and feedback, even though that was untrue.  Dr. JM and BALZER also agreed that they would intentionally not discuss with the Government a pricing arrangement between SpineFrontier and Doctors Hospital in Kansas City, Kansas, and the use of SpineFrontier products specifically in Medicaid-reimbursed procedures at Doctors Hospital.  BALZER and Dr. JM were concerned about the government finding out about the pricing arrangement.

Dr. JM's December 19, 2018 Meeting with the Government

56.     On December 19, 2018, the Government interviewed Dr. JM for the first time, after he had had several discussions with BALZER in which they attempted to coordinate their stories.  Dr. JM was represented by counsel.  During that interview, Dr. JM was shown documents the Government obtained from Dr. JM and SpineFrontier.  Dr. JM maintained in this December 2018 interview that he had performed the consulting work for which SpineFrontier and IME had paid him.  This was untrue.  Dr. JM misrepresented how much feedback he

conveyed to SpineFrontier from his consulting and evaluations. Dr. JM also said during this

December 2018 interview that he kept track of the hours he spent consulting and performing

evaluations by writing down the hours on small pieces of scrap paper that he kept. He stated that

he no longer had those pieces of scrap paper. This was untrue. Referring to a 500+ page stack of

records containing patient initials and pain scores that Dr. JM produced in response to the

Government's subpoena, Dr. JM said that he created these materials for a study he was doing at

SpineFrontier's request; he said he generated the documents in the ordinary course. This was

untrue. As described above, Dr. JM had created this 500+ page stack of records after learning of

the investigation. Finally, Dr. JM did not mention any pricing arrangements between

SpineFrontier and Doctors Hospital about which he was concerned. Despite the Government

asking Dr. JM questions about his conversations with HUMAD relating to his consulting

arrangement and how he was paid, Dr. JM did not tell the Government during his December

2018 interview about the conversations he had with HUMAD concerning the arrangement under

which SpineFrontier would pay Dr. JM 10% worth of the revenue SpineFrontier made from Dr.

JM's utilization of SpineFrontier products.

Dr. JM's Meeting with BALZER After December 19, 2018

57.      Sometime in early January 2019, BALZER told Dr. JM that he wanted to meet

with him. At that time, BALZER knew that Dr. JM had been interviewed by the Government in

December 2018. BALZER met Dr. JM at Dr. JM's house in the evening and told him to put his

phone on the deck while he and Dr. JM went somewhere else to talk. BALZER also left his

phone on the deck. BALZER and Dr. JM then took a walk outside Dr. JM's house, leaving their

phones behind.[4] BALZER explained to Dr. JM that he (BALZER) was concerned about

---

[4]      Dr. JM said that BALZER has two smartphones, both of which were Apple iPhones. One
iPhone uses the number (913) 660-4946.

exposure relating to an arrangement at Doctors Hospital concerning the pricing of, and billing

for, SpineFrontier products used there. BALZER used the term "RICO" when talking about the

Doctors Hospital arrangement and told Dr. JM that the Government "cannot know about" it.

BALZER then told Dr. JM that the only way the Government would know about the Doctor's

Hospital arrangement was if there was "a rat." BALZER told Dr. JM that if Dr. JM was to lose

his medical license due to the Government's investigation, BALZER would sell to Dr. JM his

(BALZER's) portion of a Jimmy John's franchise the two of them co-own. In addition,

BALZER told Dr. JM that if Dr. JM was sent to jail due to the investigation, BALZER would

pay Dr. JM $200,000. At this point in time, Dr. JM thought BALZER could have been recording

the conversation and Dr. JM felt uncomfortable.

Dr. JM's January 28, 2019 Interview

     58.    Dr. JM asked to speak with the Government again in January 2019. This time,

Dr. JM told the Government, among other things: (1) about the 2013 call with HUMAD in which

HUMAD told him that SpineFrontier would pay him 10% of the revenue SpineFrontier made

from SpineFrontier products Dr. JM used in his surgeries; (2) about the conversation Dr. JM had

with CHIN in which CHIN told Dr. JM that his cap on consulting fees would be increased if he

used more SpineFrontier products; (3) that in 2013, he estimated that he only performed

approximately 50% of the hours he reported working; (4) that his payments from SpineFrontier

were tied to his usage of SpineFrontier products; (5) that he frequently was told by HUMAD

through BALZER how many hours he could submit each month for his consulting and that

BALZER would fill in those hours on the Form A to be signed by Dr. JM; (6) that Dr. JM did

not do all the hours of consulting work reported in 2015 and that, throughout that year, HUMAD

told Dr. JM, through BALZER, how many hours Dr. JM could submit each month; (7) that Dr.

JM and BALZER discussed the Government's investigation after learning about it in 2017 and

that part of their discussions involved trying to coordinate their stories to falsely convey that Dr.

JM did more work than he actually did; (8) that Dr. JM and BALZER discussed that Dr. JM

would intentionally not discuss the pricing and Medicaid billing arrangement at Doctors

Hospital; (9) that Dr. JM created certain documents that never before existed and recreated other

documents after learning of the Government's investigation in order to make it appear as though

he had done more work than he actually did; and (10) that Dr. JM and BALZER had discussed

misleading the Government.

Dr. JM's and BALZER'S February 8, 2019 Recorded Conversation

59.     On February 8, 2019, with the knowledge of the Government, Dr. JM

surreptitiously recorded a conversation he had with BALZER in BALZER's parked car.  At the

beginning of the conversation, Dr. JM asked BALZER if it was "all [sic] right if we do the

thing?" to which BALZER responded "Yeah."  According to Dr. JM, both he and BALZER

pulled out their phones, placed them in Dr. JM's car, and then got into BALZER's car to have

their conversation to ensure neither was using his phone to record the conversation.

60.     During the conversation, Dr. JM raised the subject of Doctors Hospital, where

SpineFrontier has sold a significant amount of spinal product, especially between 2014 and 2016,

including for procedures in which Dr. JM had operated.  Dr. Mauricio Garcia is the President of

Doctors Hospital.  Dr. JM and BALZER had the following exchange:

| DR. JM | Yeah, I remember Garcia comin' around lookin' to see what we were usin', and they would – they would look to see how we admitted patients, you know, how it was, like, inpatient, observation …. |
| BALZER: | …. *[I]f they look, they'll find somethin'. And the thing about it is this*: is they're …creating a scenario where it, you know …. You know, in the past, like, in – when you and I have talked, I've always deferred just to, |

21

|  | just out of respect, you know, to you, but if they – *if they look, they're – they'll find somethin', but Garcia's gonna – he is going to put it on the surgeon's decision.* He will.[5] |
|---|---|

61.     Throughout the recorded conversation, Dr. JM and BALZER discussed Doctors Hospital and the fact that physicians there were encouraged to use high priced products in high volume when treating Missouri Medicaid patients while they were encouraged to use cheap, inexpensive products in lower volume on patients covered by Medicare:

| DR. JM | I'll tell you what:  if they're sittin' in front of me -- …. the people in Boston [federal prosecutors], and they say, "Explain your p— your pattern of practice, doctor, and why, why do you put these products in these people and these products in those people, and they're the same clinical scenarios?", I'll tell ya, I'm not gonna say that that's because I thought what was clinically good for the patient." |
|---|---|
| BALZER: | Mm-hmm. |
| DR. JM: | Are you gonna say that …?  Because that's, that's what you decided to do? |
| BALZER: | Right. |
| DR. JM: | You're not gonna say that. |
| BALZER: | Right. |
| DR. JM: | So hopefully it doesn't get out.  I don't know. |

62.     During the recorded conversation, Dr. JM and BALZER also discussed the opportunity to derive greater revenue specifically in Medicaid-reimbursed surgeries if the total surgery cost was driven up by using costly medical devices in the procedure:

| DR. JM | *And how is the Medicaid reimbursement? Was that…? How did they get so much outta that?* |
|---|---|
| BALZER: | Well, I don't think… I mean, I… I just -- I just know… I mean, I… I have an idea with -- what -- with how it works. Obviously, I mean, I'm not an idiot with that. I mean, I'm a s-- pretty |

---

[5]     The bold and italics emphasis has been added.

22

| | |
|---|---|
| | smart guy when it comes to that sort of thing, but I know that it wasn't really local, which is Medicare. It's basically they give you the certain amount, and then everything that's used gets taken out at a certain amount. *I think with Medicaid it's more a la carte. You know, it's for, for product. And, you know, that -- the, the different reimbursement, you know, lends itself to...* |
| DR. JM: | So they paid for what you -- |
| BALZER: | I think the products -- |
| DR. JM: | -- what you promised you -- |
| BALZER: | -- if the products -- if the products that... You weren't penalized for using products, whereas with Medicare, you are. So, so basically, like, *you got paid for what you used with Medicaid*, whereas with Medicare you had a global, and, you know, you -- with the global, you were able to, you know... *It's all about -- it was all about the margins, you know, total cost of the surgery.* |

63.     Later in the conversation, in connection with the Doctors Hospital pricing arrangement and the utilization of costly medical devices in Medicaid procedures, BALZER told Dr. JM that discussing Doctor's Hospital would not do him any good:

| | |
|---|---|
| BALZER: | ... So you – so if you – if you try to – if you try to curry favor by saying, you know *"I was – I tried to use more," yeah, you might --- you might ... open up a further investigation, but it's not gonna do you any good or lend to the further investigation, or.... I mean, you kinda lose your cards right out of the bat if you do that, if you say, "The – uh, this was a racket." Which it w—I mean, it wasn't. I mean, it w— it – they – there w—it was and it wasn't.* Like, ..., there's enough evidence on the other side ... You know, like I said, in the case of [Dr.] Gabriel, I mean, I've – uh, uh, and being in his cases, I mean, he ... You know, he ... ..... it's maybe more expensive than the national average, but it's not, like, more expensive than the highest highs. I mean, yeah, it is -- it was – it, it was an outlier, but it's not like it was – he |

|   | was using more stuff than was – you know, deemed appropriate there.  Now, the only thing that – the only real thing that, that can hold up is the fact that, yeah, there were di—there were discounts on Medicare patients.  There were absolutely discounts on – |
|---|---|

64.    Dr. JM and BALZER had further discussions about the desire for the pricing and billing issues at Doctors Hospital not to come out.  BALZER then became confused about whether Dr. JM was discussing BALZER's earlier offer to give Dr. JM $200,000 in exchange for not bringing up the Doctors Hospital if Dr. JM went to prison:

| DR. JM | I don't want to talk about Doctors stuff |
|---|---|
| BALZER: | I know. |
| DR. JM: | It doesn't do me any good.  I don't want it to come up. |
| BALZER: | No, no. |
| DR. JM: | I got enough problems. |
| BALZER: | No, I know.  It -- |
| DR. JM: | But -- |
| BALZER: | and it never will.  It never will.  It never will.  Didn't – the conversation didn't happen.  The only thing that – the only thing that, uh … The only thing that you, you know is what you know, and the conversation did not happen.  And that is – that, that is a …  That's a conversation we can have on the other side of this. |
| DR. JM: | What conversation are we talkin' about? |
| BALZER: | Which one are you talkin' about? |
| DR. JM: | No, I said I don't want to bring the Doctors -- |
| BALZER: | Oh. |
| BALZER / DR. JM: | -- (overlapping dialog; inaudible up to -- |
| BALZER: | Oh, (inaudible).  No, no, no.  I'm sayin' when we're – when – where I was out at your house, you know.  Uh, that, that … That … You know, that, that comes from the – that c—that co-- that came from the depths that's as, uh, solid within my being as, as uh, as any – as anything can be.  *But it never happened, and all – like I said, all you know is what* |

*you know.* That'll, that'll, that'll never… The
– if we need to revisit that at some point in
time, we will.  Um, but, uh, yeah, the Doctors
thing …  I, I, I mean, it …  It on—that, that
only serves …  I mean, I, I think *that is
something that will, will only exacerbate
things, and it needs to be nipped in the bud.*
And, uh, it's, it's a …  It's a scenario that you
know …  You know what you know, but you
– and what you feel, but it – that will be – it
will be misconstrued.  It will be turned
around.  It will be, you know, placed heavily
on you.  And you will be seen as an outlier,
and the bad actor, and all of the – you know,
this will all get twisted on you.  Like, like, I, I
see what's happenin' with Gabriel right now,
and how Garcia's handling Gabriel and he is
– he's got no friends.  Garcia has no friends,
inclu—I mean, including me.  I mean, if I'm
gonna tell you, at the end of the day I've
never seen him as being someone that would
go to bat for me, or anybody, and so it, it –
it'll get – it would get nasty.  It would get
really nasty. …  The – you, you ta—you talk
about your sick patients, talk about, you
know, there being no governance on that, talk
about the dynamic in healthcare and how
thing – price – pricing was getting capitated.
They started those patients.  Those weren't
your patients.  *I mean, whatever you gotta do
to justify it at the time, and if they sit there
and say, "That was wrong," just be like "In
retrospect, uh, I realize whatever, that, you
know, if … I could've probably done things
differently, but I did what I thought was
right at the time."  And they call – if they
call that misjudgment, if they call that
malpractice – they could call that anything
else.  What you don't want them to call it is
fraud or abuse.  And the problem with it is if
it goes back to Garcia and his guys, they're
gonna – they're gonna … They will, you
know, take that like red meat.  Absolutely
will.  And then you got it comin' from both
sides.  And these federal prosecutors, they're
not your friend.  They're not gonna take*

25

| | *your side.*  You're still under the spotlight for the other shit. |
|---|---|

65.     Later in the conversation, Dr. JM and BALZER again discussed BALZER's

previous offer to give Dr. JM $200,000 if Dr. JM were to go to prison:

| DR. JM | Well, if I go to jail, if I go, my wife's gonna need help. |
|---|---|
| BALZER: | I know.  Uh -- |
| DR. JM: | And it can't be 10 years. |
| BALZER: | No, no, no, no, no, no, no.  I'm – the only reason I'm saying 10 years is to let you know that I am secure for 10 years, you know? |
| DR. JM: | Mm. |
| BALZER: | It's tough to mess … You know what I'm sayin'?  Like, financially, like with regards to, like …   If – I'm assuming this all plays out in 10 years, right? (pause)  I mean, if anything's gonna play out, it's gonna happen in the next 10 years. |
| DR. JM: | Oh, yeah. |
| BALZER: | So -- |
| DR. JM: | Sooner. |
| BALZER: | -- I mean, I'm telling you the window of my being financially secure enough to act, having autonomy, having control, and, yes, I know your wife will need to be taken care of, your family. |

66.     At this point in the conversation, when Dr. JM mentioned the $200,000 figure that

BALZER had offered during their January 2019 conversation, BALZER became animated and

suspicious, asking Dr. JM if he was wearing a "wire":

| DR. JM | Well, you said 200.  Is that doable? |
|---|---|
| BALZER: | *Are you wearin' a wire?* |
| DR. JM: | *No. (laughs)* |
| BALZER: | *Show me.* |
| DR. JM: | *Show you what?* |
| BALZER: | *Well, show me – show me your – lift up your shirt.  (rumbling sound)* |
| DR. JM: | *Don't (inaudible)!  (laughter) Jesus, man!* |
| BALZER: | *Okay, no --* |

| DR. JM: | *Come on!* |
|---|---|
| BALZER: | *-- the only reason I'm doin' this is because I'd want (inaudible)! (laughs)  I feel very uncomfortable with what I said being said again.  200, cash.* |
| DR. JM: | *You can give me 200.* |
| BALZER: | *Yes, 200 cash.  Cash.  You go to jail, 200 cash.  You lose your doctor's license, we do a transfer so the [Jimmy Johns] business is yours.  (pause)* I got – I didn't tell you:  I have a property (inaudible) $25,000.  I've got a investment property that (inaudible).  It's at 350 now.  It'll probably be worth 3,000,000 in about 20 years but … |

67.     Later in the conversation, BALZER confirmed the consulting arrangement Dr. JM

had with SpineFrontier and HUMAD, under which Dr. JM was paid a percentage of revenue

SpineFrontier generated from Dr. JM's use of SpineFrontier products:

| DR. JM: | Okay.  I think there's 1 more thing I gotta talk about, and, um, it's more like housekeeping.  Um, so I think they're [the Government] gonna come back for another round of questioning.  Um, you know, I took a lot of money for what I did.  That's … *That's hard to hide.  Uh, there's not a whole lot that, that they have to prove that – of my work.  So what I – I'm trying to figure out is am I looking at being just overpaid, or is it gonna come out that they, they were – you know, the plan was to do a percentage?  And I've, I've asked you this before:  Does anyone else know what that deal was?* |
|---|---|
| BALZER: | *Mm-mm.  No.  Verbal conversations with Aditya [HUMAD] only.* |
| DR. JM: | *Just Aditya [HUMAD].* |
| BALZER: | *Yes.* |
| DR. JM: | *You're 100% sure.* |
| BALZER: | *Yes.* |
| DR. JM: | Do you …. (laughs)  Do you remember that time when I said we were gettin' – the, the checks were comin' with, with the , the surgeries, basically?  And I said, "Hey, doesn't that look kinda suspicious that we |

| | |
|---|---|
| | keep getting' paid based on volume?" *And you talked to Aditya, and he's like, "Oh, no, it looks better that way, 'cause you're doin' more evaluations."* |
| BALZER: | *I remember him saying that the evalu .... Yeah, I remember that.  Yeah, I remember him saying it looks better the more evaluations.* |
| DR. JM: | How stupid were they?  I feel like, you know, they should've known better. |
| BALZER: | I feel like – uh, and I – and I've seen this I've seen this with immigrants:  if shit works differently in other countries, and it's like they come from these corrupt or, uh, broken down, you know, you know in—uh, structures or whatever, (coughs) and they – and they see that as bein', like, just the way things are done.  *I mean, in most of the world, kickbacks are how things get done, from the top to the – from the bottom to the top.* |

68.     During the recorded conversation, BALZER repeatedly offered suggestions about

what Dr. JM should say when questioned by the Government about the consulting payments he

received from SpineFrontier, including what Dr. JM should tell the Government in response to

questions about the actual work he did for SpineFrontier.  As outlined above, however, BALZER

knew that these suggestions were false because BALZER was privy to – and participated in – the

arrangement under which SpineFrontier would pay Dr. JM a percentage of the revenue

SpineFrontier generated from Dr. JM's use of SpineFrontier's products in his surgeries.

BALZER also knew his suggestions were untrue because he participated in the sometimes-

monthly process of asking HUMAD how many hours Dr. JM could bill, and putting that number

of hours on a timesheet for Dr. JM to sign for submission.  For example, BALZER encouraged

Dr. JM to say the following:

| | |
|---|---|
| BALZER: | .... "I mean, whatever.  Whatever you can say that is credible, that they can look at, they can look at other institutions ....  Like with the consulting, other examples, where you can say, "Listen, this is the last |

place I ever wanted to be in my career, and, you know, I feel like I'm being hung out to dry by SpineFrontier. I feel betrayed by them, and I feel like the fact that they don't have any of my stuff pisses me off. I never got responses on feedback that I gave them. They said they never received stuff." I mean, there's enough dysfunctionality within SpineFrontier right now that throwin' them under the bus and exhibiting your frustration over it, while bolstering your other cases – you know, "I've, I've worked -- I've done consulting in the past. I do this. I feel like this before. You know, this is not illegal. I feel like this was horribly mishandled. You know, I've busy takin' care of patients, try—tryin' to keep – you know, tryin' to keep – you know, tryin' to maintain these other aspects of my business, and I feel like they dropped the ball. They let me down. I don't feel like the only one they let down. And I regret having ever worked with them. You know, if you look at what I do, I just do – clinically, I just do clamps and biologics." You know, let them see your practice in the context it exists, which is gonna be a challenge enough, because you do—you, you aren't run of the mill, you know, as a surgeon ….. You know, I don't think it hurts to tout and, and eat the time up with your clinical acumen. I don't think it hurts at all. You know, you want them to – you want them to vis—and I'm – like I said, I feel like I'm givin' you advice – if your lawyers haven't already told you this, you want them to see a, a doctor in front of them, not a businessman.

\* \* \*

| BALZER: | …. And, you know, you got into -- you got into an environment with a company that was, you s-- have soon seen, out of their league, incompetent in handling your doctor services, and your doctor feedback, time and time again. ***And they don't have -- if they don't have shit, just be like, "I don't believe that. I don't believe that they don't have shit." That pisses me off." You have nothin' to lose by throwin' them under the fuckin' bus.*** |

\* \* \*

| BALZER: | "SpineFrontier. I'll tell you how they used me. Look at their notes on me. What do they say?" "Well, we don't have a lot of notes on them from you. Did you do any |

|  | work?" "I don't know if anybody did any work at this point. I'm missin' a whole lotta stuff. There's a whole lotta gaps. And all I could tell you is that I consulted with SpineFrontier. They were shut -- they were -- I should've known better. They were not as responsive as other companies I'd worked with. (pause) It's frustrating to me. My intention was to consult, like I had before, and now I'm sittin' here." So it's okay. You're, you're not being angry at the federal prosecutors. If you sit there looking guilty, like a -- like a robber, then they're gonna start really kinda lookin' at you, like this -- what's this guy know? You know -- |
| --- | --- |

69.     BALZER also suggested that Dr. JM not to discuss with the Government issues

relating to SpineFrontier device pricing and overutilization of medical devices in Medicaid-

reimbursed surgeries at Doctors Hospital, at times telling Dr. JM that doing so could subject him

to retaliation from others at that institution:

| DR. JM: | But if it does, and they [the Government] say, "Well, how come these products were used in this case, and these products were used for this case? -- |
| --- | --- |
| BALZER: | Right. |
| DR. JM: | -- you know, at the end of the day, Doctors Hospital was callin' the shots. |
| BALZER: | They were. They were callin' the shots, and you, at the -- at -- and this is how -- that's the fine -- that's the fine line, is how are they callin' the shots? "Well, I couldn't use any other products than the capitated products on Medicare cases*." I wouldn't expound upon your other stuff, because here's the thing is if you became -- if you become a witness against them, once again, how does that...? Does it grant you immunity? I don't know what, what the benefit is there.  If you could become a witness against them, they will skewer you as an outlier.* And they -- and they may settle in as... They may settle in as, okay, yes, on Medicare cases, it's clear you could -- you know, once they've d- defined that, we held the pro-- prices down. But where it gets into tricky territory -- and this is absolutely cro-- you know, crossing the line -- is what were, were s-- was stuff used just for the sake of profit.  And whether or not that was your intention, once you cross that line, especially if you're a witness against them, they will use the consulting |

30

|  | agreement. They will use everything that they can. ***And they -- and you'll h-- like I said, y-y-- they'll be attacking you, and you will be -- they will put you on the outside. And th-- as their defense. That's how they're -- they're -- that's how they'll take down the star witness. And, you know...*** (pause) |
|---|---|

70.     In making these suggestions to Dr. JM, BALZER cautioned Dr. JM about telling

the Investigative Team the truth:

| BALZER: | . . . [T]he only reason I'm drivin' home that point is because you -- if you are goin' out there to meet with them, just, just be careful. Just be careful. And I know -- I've seen -- I've seen this done where -- and -- where you're -- where... And I don't -- I don't know necessarily by you, but ***Gabriel did this once where he's like, "The facts are the facts. Let the facts speak for themselves." Then he fucked all things up 6 ways to Sunday, because he believes in the facts as they happened, but when you put the facts out there as you see them, you lose control. And perception is the reality, and you want to control the ball. You want to control things.*** And if they make accusations towards you that require them to prove your intention -- why did you use so many strips? When they make those accusations toward you, (laughs) they're t-- putting the burden on you to defend yourself. Before that -- before it even gets to that point, focus on being a doctor. Prepare for your defense, in terms of saying, "My practice..." And go into a long diatribe about your practice. Go into a long d-- you know, let them see the doctor. |
|---|---|

***

| BALZER: | And, [Dr. JM], I'm not saying that I am worried that you're going to open the door to Doctors Hospital, and all of a sudden they're gonna see it. ***I'm worried about you being the guy to open the door, and not getting -- first of all, not getting any benefit from it.*** I mean, like, going down that road is a slippery slope, not getting any benefit from that, and then incrimin-- incriminating yourself further. That's, that's my concern about it. ***If they f-- if they find their way to Doctors Hospital, so be it. Really. Uh, I mean, that's,*** |
|---|---|

| | |
|---|---|
| | *that's my attitude at this point. If you're the guy standin' over at -- sittin' over there on the witness stand, and, you know, whatever, whistleblower or whatever...* |
| DR. JM: | I don't think I'm gonna be a whistleblower at this point.  (laughter)  Whistleblowers get paid! |
| BALZER: | Right.  But -- |
| DR. JM: | Think there might be a payout? |
| BALZER: | *I'm just sayin', there might be a -- some sort of reprieve by -- from that particular charge that involves Doctors Hospital, but, um, you're gonna get -- you're gonna get skewered.* |

**PROBABLE CAUSE TO BELIEVE THAT EVIDENCE, FRUITS, AND
INSTRUMENTALITIES OF THE CRIMES IDENTIFIED ABOVE WILL
BE FOUND AT THE TARGET LOCATIONS AND IN THE TARGET ACCOUNT**

71.    I submit that there is probable cause to believe that the TARGET LOCATIONS,

as described in Attachment A-1 (the BALZER RESIDENCE) and Attachment A-2 (BALZER)

will contain evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, as

described in Attachment B-1 (the BALZER RESIDENCE) and Attachment B-2 (BALZER).  I

also submit that there is probable cause to believe that the TARGET ACCOUNT

(bionnovations@sbcglobal.net), as described in Attachment A-3, as well as data associated with

that account, contains evidence, fruits, and instrumentalities of the TARGET OFFENSES as

described in Attachment B-3.

**The BALZER RESIDENCE**

72.    Based on the foregoing, my review of records, my interviews of individuals

relevant to this investigation, property records, and my training and experience, there is probable

cause to believe that BALZER permanently resides at the BALZER RESIDENCE and that he

works out of the BALZER RESIDENCE, which has the same address as BIOinnovations LLC,

the company through which BALZER acts as a distributor for medical device manufacturers. There is also probable cause to believe that the BALZER RESIDENCE contains evidence relating to SpineFrontier's relationship with Dr. JM and SpineFrontier, as well as payments to Dr. JM for his alleged consulting. There is also probable cause to believe that the BALZER RESIDENCE contains evidence relating to Doctors Hospital's relationship with SpineFrontier and Doctors Hospital's overutilization of SpineFrontier products on certain patients covered by Missouri Medicaid.

73.    First, there is probable cause to believe that BALZER lives and operates his BIOinnovations business, at least in part, at the BALZER RESIDENCE – i.e., 8645 Woodland Terrace, Lenexa, Kansas. According to NCIC databases, BALZER has lived at this location since April 2013. According to Dr. JM, BALZER currently lives at the BALZER RESIDENCE.

74.    Second, I have reviewed bank records obtained from U.S. Bank relating to BIOinnovations. Statements from March 2017 through January 2019 pertaining to BIOinnovations list its address as 8645 Woodlands Terrace, Lenexa, Kansas 66220-3107. Prior to that time, the address listed on the bank statements for BIOinnovations from January 2013 to February 2017 was 441 W 77th Terrace, Prairie Village, Kansas 66208. In addition, numerous checks issued to BIOinnovations from medical device manufacturers, including SpineFrontier, are made payable to "BIOinnovations, 8645 Woodland Terrace, Lenexa, KS 66220," which is the address of the BALZER RESIDENCE.

75.    Third, I have reviewed internal company documents from SpineFrontier, including documents showing that BALZER and BIOinnovations act as distributors for SpineFrontier. Those documents show that that BALZER and BIOinnovations provide SpineFrontier products for surgeries performed by Dr. JM, Dr. Mauricio Garcia, and others at Doctors Hospital. Internal SpineFrontier documents also show that BALZER and

BIOinnovations received inventory of SpineFrontier product from SpineFrontier at the BALZER

RESIDENCE – i.e., 8645 Woodland Terrace, Lenexa, Kansas address.

76.     Based upon my training and experience, individuals who maintain businesses

typically keep records relating to that business – such as contracts with customers and suppliers,

calendars, correspondence, email financial records, inventory documents – at the business'

identified location.  Accordingly, there is probable cause to believe the BALZER RESIDENCE,

which uses the same address as BIOinnovations, will contain business records relating to

BIOinnovations and its interactions with Doctors Hospital, Dr. JM, and SpineFrontier.  Based on

my training and experience, individuals engaged in schemes like the TARGET OFFENSES

described above sometimes keep records pertaining to those offenses at their homes to keep them

away from other employees who are not involved in conduct underlying the offenses and to

avoid a situation where their business address is audited for some reason.  Accordingly, there is

probable cause to believe that the BALZER RESIDENCE will contain evidence of the target

offenses described above.

77.     The BALZER RESIDENCE also likely contains electronic copies of documents

relevant to the TARGET OFFENSES.  I know from my training and experience that individuals

often retain copies of important documents on their computers or other electronic devices

capable of storing information for a long time.  Here, there are a number of documents that

BALZER has likely retained that will be relevant to the TARGET OFFENSES.   For example,

electronic devices in the BALZER RESIDENCE likely include documentation or records

concerning surgeries performed at Doctors Hospital with which BALZER assisted; surgeries

performed by Dr. JM with which BALZER assisted; payments from SpineFrontier to BALZER

and Dr. JM; ledgers or lists showing how many SpineFrontier products were used in surgeries

performed by particular physicians (including Dr. JM); and timesheets showing hours submitted

by BALZER for Dr. JM that were dictated to BALZER by HUMAD.   I have reviewed emails
from SpineFrontier that relate to these topics on which BALZER email address appears
(bioinnovations@sbcglobal.net).  For example, I have reviewed the following types of emails
with BALZER's email address on them:

- emails relating to Dr. JM's consulting agreement with SpineFrontier and its terms;

- emails pertaining to the number of surgeries performed by Dr. JM and physicians at Doctors Hospital using SpineFrontier products;

- emails relating to how supposed feedback from surgeries by Dr. JM would be provided to SpineFrontier;

- emails to and from SpineFrontier pertaining to BALZER assisting Dr. JM in the submission of the hours Dr. JM allegedly spent consulting;

- the increase in Dr. JM's consulting rate for his alleged evaluation of SpineFrontier products;

- emails about commissions SpineFrontier paid BALZER for his work as a distributor for SpineFrontier and for his work to support Dr. JM and other physicians who SpineFrontier products; and

- emails about the financial arrangement pertaining to Doctors Hospital's purchase and use of SpineFrontier implants;

78.     While these illustrative emails have already been obtained from SpineFrontier, I
know from my training and experience that individuals can and do delete emails from their
Internet-based inboxes but retain copies of those emails on their hard drives.  I also know that
individuals often have multiple email accounts, some of which may not be known to law
enforcement, and as a result, electronic devices can be a unique repository of all emails relevant
to certain TARGET OFFENSES.  Accordingly, emails like the ones described above relevant to
the TARGET OFFENSES are likely stored on electronic devices in the BALZER RESIDENCE.

**BALZER**

79.     Although BALZER appears to be residing at the BALZER RESIDENCE, it is unknown whether he will be physically present within the BALZER RESIDENCE at the moment the warrant sought herein is executed.  If BALZER is not within the BALZER RESIDENCE at that moment, the two iPhones will likely be on his person.

80.     I know BALZER carries his iPhones with him.  As described above, when BALZER and Dr. JM have met in person over the course of the last few months, BALZER has had one of the iPhones on his person and has requested that both Dr. JM and he place their phones in a spot remote from where their conversation takes place to avoid any audio recording.

81.     I also know that Dr. JM exchanges texts with BALZER on a BALZER iPhone with the number (913) 660-4946 about surgical cases Dr. JM performs, including those he performs using SpineFrontier devices.  I have reviewed text messages between BALZER and Dr. JM on Dr. JM's iPhone that pertain to Dr. JM's cases and other cases at Doctors Hospital.  These texts are exchanged between Dr. JM and BALZER at the phone number: (913) 660-4946.  For example:

- On August 3, 2018, Dr. JM texted BALZER to tell him that:  "I have an asap pt neck and back for Gabriel call me to help facilitate please."

- On October 21, 2018, Monte and BALZER communicated via text about a meeting Garcia – the president of Doctors Hospital – was having with Dr. JM:

| DR. JM: | Are you coming to dinner tomorrow? |
|---------|-----------------------------------|
| BALZER: | Dinner? |
| DR. JM: | Garcia wants to meet with me I assumed you were coming |
| BALZER: | Looks like I have to deal with him by myself? |
| DR. JM: | Are you coming to dinner tomorrow? |
| BALZER: | I didn't even know about it.  I know he's been talking about you.  I am glad to see him take initiative<br>How are you doing? |

| DR. JM: | I'm good. Not looking forward to this meeting though. You know how it is. |
|---|---|
| BALZER: | Yes. |

- On October 22, 2018, Dr. JM and BALZER again communicated via text about Dr. JM's meeting with Garcia:

| BALZER: | FYI: Garcia is looking for general ortho and has been talking about Roberts and Jakob |
|---|---|
| BALZER: | Jakoi |
| DR. JM: | Call if you can |
| BALZER: | 5 min |
| BALZER: | Sorry, I was in a very precarious situation |

- Over the next two days, October 23 and 24, 2018, Dr. JM and BALZER communicated about another physician at Doctors Hospital and a meeting that Dr. JM was having with Garcia, the president of Doctors Hospital.

| DR. JM: | Is Gabriel still working |
|---|---|
| BALZER: | Yes. He will be there at least til the end of the year. Garcia is looking for other option though. |

| BALZER: | You and Garcia had a good dinner? |
|---|---|
| DR. JM: | Yes I enjoyed the food |
| BALZER: | Lol, that's good. more vague BS? |
| DR. JM: | No not vague clear. BS? Maybe |
| BALZER: | That's good. At least you weren't left wondering what he said (figuratively and literally) |

82.     Based on my training and experience, I know that individuals who engage in financial crimes, including violations of the AKS, commonly use computers and other electronic devices, such as cellphones and tablets, to communicate with co-conspirators, keep financial ledgers, and retain fraudulent documents or documents evidencing fraudulent activity for a long time. As a result, they often store data on their computers or electronic devices related to their illegal activity, which can include logs of online or cellphone-based "chats" with co-

conspirators; email correspondence; text messages; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts; and/or records of uses of funds.  For example, electronic devices, such as Apple iPhones, on BALZER's person may include documentation or records about cases done at Doctors Hospital that BALZER assisted with, cases done by Dr. JM that BALZER assisted with, payments from SpineFrontier, ledgers or lists showing how many SpineFrontier products were used in surgeries performed by particular physicians (including Dr. JM), fraudulent timesheets showing hours that BALZER filled out for Dr. JM that were dictated to BALZER by HUMAD.

**The TARGET ACCOUNT (bioinnovations@sbcglobal.net)**

83.    I submit that there is probable cause to believe that the email account identified as bioinnovations@sbcglobal.net, as well as the data associated with this account, contains evidence, fruits, and instrumentalities of the TARGET OFFENSES.

84.    Dr. JM confirmed for the investigative team that BALZER's email address for BIOinnovations is bioinnovations@sbcglobal.net.  The investigative team also is in possession of email communications from BALZER to SpineFrontier where he uses the email address bioinnovations@sbcglobal.net.

85.    BALZER uses the TARGET ACCOUNT to send and receive email communications related to the TARGET OFFENSES.  The investigative team is in possession of emails exchanged between BALZER at the TARGET ACCOUNT, employees of SpineFrontier (including CHIN and HUMAD), and physicians such as Dr. JM.  A review of these emails reveals that BALZER uses the TARGET ACCOUNT to send and receive:

- emails relating to Dr. JM's consulting agreement with SpineFrontier and its terms;

- emails pertaining to the number of surgeries performed by Dr. JM and physicians at Doctors Hospital using SpineFrontier products;

- emails relating to how supposed feedback from surgeries by Dr. JM would be provided to SpineFrontier;

- emails to and from SpineFrontier pertaining to BALZER assisting Dr. JM in the submission of the hours Dr. JM allegedly spent consulting;

- the increase in Dr. JM's consulting rate for his alleged evaluation of SpineFrontier products;

- emails about commissions SpineFrontier paid BALZER for his work as a distributor for SpineFrontier and for his work to support Dr. JM and other physicians who SpineFrontier products; and

- emails about the financial arrangement pertaining to Doctors Hospital's purchase and use of SpineFrontier implants

86.    A review of the publicly available mail exchanger record for the domain name sbcglobal.net reveals that AT&T Services, Inc. is the company responsible for receiving or handling mail for that domain name. A mail exchanger record specifies the mail server responsible for accepting email messages on behalf of a domain name.  A review of publicly-available Internet Corporation for Assigned Names and Numbers (ICANN) record shows that the domain name sbcglobal.net is assigned to AT&T Services, Inc.  Consistent with this, according to AT&T Inc.'s website, AT&T Services, Inc. and SBC Global Services, Inc. are both legal entities of AT&T Inc.

87.    On January 31, 2019, the United States Attorney's Office for the District of Massachusetts sent AT&T a letter requesting under 18 U.S.C. § 2703(f) that the company preserve records associated with bioinnovations@sbcglobal.net, the TARGET ACCOUNT, for a period of 90 days.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

88.     There is probable cause to believe that electronic equipment was used in connection with violations of federal law, and the equipment will be found at the BALZER RESIDENCE or on BALZER.

a.      From my training, experience, and information provided to me by other agents, I am aware that businesses frequently use computers to carry out, communicate about, and store records about their business operations.  These tasks are frequently accomplished through sending and receiving business-related e-mail and instant messages; drafting other business documents such as spreadsheets and presentations; scheduling business activities; keeping a calendar of business and other activities; arranging for business travel; storing pictures related to business activities; purchasing and selling inventory and supplies online; researching online; and accessing banking, financial, investment, utility, and other accounts concerning the movement and payment of money online.

b.      From my training, experience, and information provided to me by other agents, I am aware that businesses and individuals commonly store records of the type described in Attachment B-1 and Attachment B-2 in computer hardware, computer software, smartphones, and storage media.  Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B-1's and Attachment B-2's definition of "hardware") can now function essentially as small computers.  Apple iPhones, such as the two that BALZER has, are a type of smartphone.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and

amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

      c.      As described above, BALZER's distributor company, BIOinnovations, is based out of his home at 8645 Woodland Terrace, Lenexa, Kansas and BALZER sent and received numerous emails from his BIOinnovations email address.

      d.      Therefore, there is probable cause to believe that computer equipment capable of accessing the internet was used at 8645 Woodland Terrace, Lenexa, Kansas in connection with the Target Offenses.

89.      Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

      a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

      b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.      Wholly apart from user-generated files, computer storage mediaCin particular, computers' internal hard drivesCcontain electronic evidence of how the

computer has been used, what it has been used for, and who has used it.  This evidence

can take the form of operating system configurations, artifacts from operating system or

application operation, file system data structures, and virtual memory "swap" or paging

files.  It is technically possible to delete this information, but computer users typically do

not erase or delete this evidence because special software is typically required for that

task.

d.      Similarly, files that have been viewed over the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."  The browser

often maintains a fixed amount of hard drive space devoted to these files, and the files are

overwritten only as they are replaced with more recently viewed Internet pages or if a

user takes steps to delete them.

e.      In addition, based on my knowledge, training, and experience, I know that

businesses and businesspeople often retain correspondence, financial, transactional, and

other business records for years to identify past customers and vendors for potential

future transactions; keep track of business deals; monitor payments, debts, and expenses;

resolve business disputes stemming from past transactions; prep are tax returns and other

tax documents; and engage in other business-related purposes.

90.      Based on my knowledge and training and the experience of other agents with

whom I have spoken, I am aware that in order to completely and accurately retrieve data

maintained in computer hardware, computer software or storage media, to ensure the accuracy

and completeness of such data, and to prevent the loss of the data either from accidental or

programmed destruction, it is often necessary that computer hardware, computer software, and

storage media (Acomputer equipment@) be seized and subsequently processed by a computer

specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

      a.      The volume of evidence C storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

      b.      Technical requirements C analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

91.     The BALZER RESIDENCE may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner=s knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B-1 and Attachment B-2 are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

92.     In this case, I recognize that BIOinnovations is a functioning company that may perform some legitimate business functions, and that seizing computer equipment may have the unintended and undesired effect of limiting the company's ability to function.

        a.     As stated above, there are a variety of reasons why law enforcement agents might need to seize the computer equipment for subsequent processing elsewhere. If BIOinnovations requires access to data that is not contraband or evidence of a crime, the government will work with the company after the search to copy this data onto storage media provided by the company for the company=s use.

        b.     If the search team determines that there is no reason to seize certain of BIOinnovations' computer equipment during the execution of this warrant, the team will create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical. Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files. Imaging permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment. However, imaging at the premises can often be

impractical, because imaging is resource-intensive:  it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than they would remain if they seized the items, and it can require personnel with specialized experience and specialized equipment, both of which might be unavailable.  If law enforcement personnel do create an image at the premises, they will then search for the records and data specified in the warrant from the image copy at a later date off-site.

### UNLOCKING AN APPLE DEVICE USING TOUCH ID FEATURE

93.      As noted above, BALZER carries two Apple iPhones.  It is therefore likely that the BALZER RESIDENCE will contain two Apple iPhones belonging to BALZER if BALZER is present at the time of the search.

94.      I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

95.      If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents.  This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

96.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

97.     The passcode(s) that would unlock the two BALZER iPhones is/are not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the two iPhones to the devices' Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

98.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require BALZER to press his fingers against the Touch ID sensor of the locked Apple device(s) found during the search of the BALZER RESIDENCE in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

99.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of BALZER to the Touch ID sensor of any iPhone found at the BALZER RESIDENCE for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

## TECHNICAL BACKGROUND

100.     In my training and experience, I have learned that email-hosting companies, such as AT&T Internet Services, maintain computer servers connected to the Internet. Their customers use those computers to send and receive email on the Internet. Customers can typically access their accounts on the company's email servers from any computer connected to the Internet.

101.     Through my investigation, I have learned that the TARGET ACCOUNT is hosted by AT&T.

102.     When an email user sends an email, it is initiated at the user's computer, transferred via the Internet to the computer servers of the user's email provider, and then transmitted to its end destination. Conversely, an email sent to an email recipient is transmitted to the computer servers of the recipient's email provider where it can be accessed by the recipient and transferred to the recipient's computer to be read.

103.     In my training and experience, I have learned that email service providers typically allow customers to store incoming and outgoing emails on the email service provider's computer servers. These emails can be stored on the email service provider's computer servers until the customer elects to remove or delete the emails from the service provider's computer servers, until the customer's mailbox reaches storage limitations set by the email service provider, or until other terms set by the email service provider are met. In the case of emails that are removed or deleted from the email service provider's computer servers by a customer, email

service providers may retain those emails for a period of time, known as a deleted item retention period.

104.    Email providers also typically maintain electronic records relating to their customers.  These records include account application information, account access information, and email transaction information.

105.    Many e-mail providers can also provide the following additional information associated with a subscriber's account:  address books; buddy lists; photos, files, data, or other information; and World Wide Web profiles or homepages.

## **LEGAL AUTHORITY**

106.    The government may obtain both electronic communications and subscriber information from an email provider by obtaining a search warrant.  18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

107.    Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the service provider whose information will be searched.  18 U.S.C. § 2703(b)(1)(A).  Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant.  18 U.S.C. § 2703(g).

108.    If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber.  18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

109.    This application seeks a warrant to search all responsive records and information under the control of AT&T, a provider subject to the jurisdiction of this court, regardless of where AT&T has chosen to store such information.  Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the requested warrants of the contents of

wire or electronic communications and any records or other information pertaining to the

customers or subscribers if such communication, record, or other information is within AT&T's

possession, custody, or control, regardless of whether such communication, record, or other

information is stored, held, or maintained outside the United States.

### REQUEST TO SEAL AND PRECLUDE NOTICE TO THE SUBSCRIBER(S)

110.    I request that this affidavit, the applications, the warrants, the order to seal, and

any related papers be sealed by the Court until such time as the Court, pursuant to Local Rule

CR49.6, directs otherwise.

111.    I further request that, pursuant to the preclusion-of-notice provisions of 18 U.S.C.

§ 2705(b), the Court order AT&T not to notify any person (including the subscriber to whom the

materials relate) of the existence of the application associated with each of the TARGET

ACCOUNT or the Court's Order associated with the TARGET ACCOUNT for the earlier of one

year from the date of the Court's Order or upon notice by the government within 30 days of the

conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b).

Non-disclosure is appropriate in this case because the Court's Order associated with the

TARGET ACCOUNT relates to an ongoing criminal investigation that is neither public nor

known to all of the targets of the investigation, and its disclosure may alert the targets to the

existence of investigation.  There is accordingly reason to believe that notification of the

existence of the Order associated with the TARGET ACCOUNT will seriously jeopardize the

investigation, including by giving targets an opportunity to flee prosecution, destroy or tamper

with evidence, change patterns of behavior, or intimidate potential witnesses.  *See* 18 U.S.C. §

2705(b).  Moreover, some of the evidence in this investigation is stored electronically.  If alerted

to the existence of the Order associated with the TARGET ACCOUNT, the targets could destroy

that evidence, including information saved to their personal computing devices, on other electronic media, or in social media accounts.

## FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT

112.    Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance.  If the Court issues the warrant, the United States will execute it not by entering the premises of AT&T, as with a conventional warrant, but rather by serving a copy of the warrant on AT&T and awaiting its production of the requested data.  This practice is approved in 18 U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

113.    Based on my training and experience, I understand that email and website hosting providers sometimes produce data in response to a search warrant outside the 14-day (formerly 10-day) period set forth in Rule 41 for execution of a warrant.  I also understand that email and website hosting providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

114.    The United States does not ask for this extra data or participate in its production.

115.    Should the AT&T produce late-created data in response to this warrant, I request permission to view all late-created data that was created by AT&T, including subscriber, IP address, logging, and other transactional data, without a further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.  However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as email, web pages, or files, absent a follow-up warrant.

116.     For these reasons, I request that the Court approve the procedures in Attachment B-3, which sets forth these limitations.

## **CONCLUSION**

117.     Based on the information described above, I submit there is probable cause to believe that CHIN, BALZER, HUMAD, DUDLEY, SpineFrontier, IME, and KIC Ventures, through their managing employees, have violated or conspired to violate 42 U.S.C. § 1320a-7b(b)(2)(A), the Anti-Kickback Statute.  I also submit that there is probable cause to believe that BALZER has violated or conspired to violate 18 U.S.C. §§ 1510, 1512, and 1518.   Based on the information described above, I submit that there is probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachments B-1 and B-2 are contained within the BALZER RESIDENCE or on BALZER's person, as described in Attachments A-1 and A2, respectively.

118.     Based on the information described above, I submit that there is probable cause to believe that computer systems owned or operated by AT&T Internet Services hold evidence, fruits, and instrumentalities of the crimes described immediately above as described in the respective Attachments A-3 and B-3.  The procedures for copying and reviewing the relevant records are set out in Attachment B-3.

Respectfully submitted,

MEAGHAN FLEURY
Special Agent, Department of Health and
Human Services


Subscribed and sworn to before me on ___April 18, 2019___ ,

[Magistrate]
United States Magistrate Judge